(Slip Opinion) OCTOBER TERM, 2015 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## OCASIO *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 14–361.   Argued October 6, 2015—Decided May 2, 2016

Petitioner Samuel Ocasio, a former police officer, participated in a kickback scheme in which he and other officers routed damaged vehicles from accident scenes to an auto repair shop in exchange for payments from the shopowners. Petitioner was charged with obtaining money from the shopowners under color of official right, in violation of the Hobbs Act, 18 U. S. C. §1951, and of conspiring to violate the Hobbs Act, in violation of 18 U. S. C. §371. At trial, the District Court rejected petitioner's argument that—because the Hobbs Act prohibits the obtaining of property "from another"—a Hobbs Act conspiracy requires proof that the alleged conspirators agreed to obtain property from someone outside the conspiracy. Petitioner was convicted on all counts, and the Fourth Circuit affirmed. Petitioner now challenges his conspiracy conviction, contending that he cannot be convicted of conspiring with the shopowners to obtain money from them under color of official right.

*Held*: A defendant may be convicted of conspiring to violate the Hobbs Act based on proof that he reached an agreement with the owner of the property in question to obtain that property under color of official right. Pp. 5–18.

(a) The general federal conspiracy statute, under which petitioner was convicted, makes it a crime to "conspire . . . to commit any offense against the United States." 18 U. S. C. §371. Section 371's use of the term "conspire" incorporates age-old principles of conspiracy law. And under established case law, the fundamental characteristic of a conspiracy is a joint commitment to an "endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense." *Salinas* v. *United States*, 522 U. S. 52, 65. A conspirator need not agree to commit the substantive offense—or

even be capable of committing it—in order to be convicted.  It is sufficient that the conspirator agreed that the underlying crime *be committed* by a member of the conspiracy capable of committing it.  See *id.*, at 63–65; *United States* v. *Holte*, 236 U. S. 140; *Gebardi* v. *United States*, 287 U. S. 112.  Pp. 5–10.

(b) These basic principles of conspiracy law resolve this case.  To establish the alleged Hobbs Act conspiracy, the Government only needed to prove an agreement that *some conspirator* commit each element of the substantive offense.  Petitioner and the shopowners reached just such an agreement: They shared a common purpose that *petitioner* and other police officers would obtain property "from another"—that is, from the shopowners—under color of official right.  Pp. 10–14.

(c) Contrary to petitioner's claims, this decision does not dissolve the distinction between extortion and conspiracy to commit extortion.  Nor does it transform every bribe of a public official into a conspiracy to commit extortion.  And while petitioner exaggerates the impact of this decision, his argument would create serious practical problems.  Under his approach, the validity of a charge of Hobbs Act conspiracy would often depend on difficult property-law questions having little to do with culpability.  Pp. 14–18.

750 F. 3d 399, affirmed.

ALITO, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, and KAGAN, JJ., joined.  BREYER, J., filed a concurring opinion.  THOMAS, J., filed a dissenting opinion.  SOTOMAYOR, J., filed a dissenting opinion, in which ROBERTS, C. J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 14–361

SAMUEL OCASIO, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[May 2, 2016]

JUSTICE ALITO delivered the opinion of the Court.

Petitioner Samuel Ocasio, a former officer in the Baltimore Police Department, participated in a kickback scheme with the owners of a local auto repair shop. When petitioner and other Baltimore officers reported to the scene of an auto accident, they persuaded the owners of damaged cars to have their vehicles towed to the repair shop, and in exchange for this service the officers received payments from the shopowners. Petitioner was convicted of obtaining money from the shopowners under color of official right, in violation of the Hobbs Act, 18 U. S. C. §1951, and of conspiring to violate the Hobbs Act, in violation of 18 U. S. C. §371. He now challenges his conspiracy conviction, contending that, as a matter of law, he cannot be convicted of conspiring with the shopowners to obtain money from them under color of official right. We reject this argument because it is contrary to age-old principles of conspiracy law.

I

Hernan Alexis Moreno Mejia (known as Moreno) and Edwin Javier Mejia (known as Mejia) are brothers who co-owned and operated the Majestic Auto Repair Shop (Ma-

jestic). In 2008, Majestic was struggling to attract cus-
tomers, so Moreno and Mejia made a deal with a Balti-
more police officer, Jhonn Corona. In exchange for kick-
backs, Officer Corona would refer motorists whose cars
were damaged in accidents to Majestic for towing and
repairs. Officer Corona then spread the word to other
members of the force, and eventually as many as 60 other
officers sent damaged cars to Majestic in exchange for
payments of $150 to $300 per referral.

Petitioner began to participate in this scheme in 2009.
On several occasions from 2009 to 2011, he convinced
accident victims to have their cars towed to Majestic.
Often, before sending a car to Majestic, petitioner called
Moreno from the scene of an accident to ensure that the
make and model of the car, the extent of the damage, and
the car's insurance coverage would allow the shopowners
to turn a profit on the repairs. After directing a vehicle to
Majestic, petitioner would call Moreno and request his
payment.

Because police are often among the first to arrive at the
scene of an accident, the Baltimore officers were well
positioned to route damaged vehicles to Majestic. As a
result, the kickback scheme was highly successful: It
substantially increased Majestic's volume of business and
profits, and by early 2011 it provided Majestic with at
least 90% of its customers.

Moreno, Mejia, petitioner, and nine other Baltimore
officers were indicted in 2011. The shopowners and most
of the other officers eventually pleaded guilty pursuant to
plea deals, but petitioner did not.

In a superseding indictment, petitioner was charged
with three counts of violating the Hobbs Act, 18 U. S. C.
§1951, by extorting money from Moreno with his consent
and under color of official right. As all parties agree, the
type of extortion for which petitioner was convicted—
obtaining property from another with his consent and

under color of official right—is the "rough equivalent of what we would now describe as 'taking a bribe.'" *Evans* v. *United States*, 504 U. S. 255, 260 (1992). To prove this offense, the Government "need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.*, at 268.

Petitioner and another Baltimore officer, Kelvin Quade Manrich, were also charged with violating the general federal conspiracy statute, 18 U. S. C. §371. The indictment alleged that petitioner and Manrich conspired with Moreno, Mejia, and other Baltimore officers to bring about the same sort of substantive violations with which petitioner was charged.

Before trial, petitioner began to raise a variant of the legal argument that has brought his case to this Court. He sought a jury instruction stating that "[i]n order to convict a defendant of conspiracy to commit extortion under color of official right, the government must prove beyond a reasonable doubt that the conspiracy was to obtain money or property from some person who was not a member of the conspiracy." App. 53. In support of this instruction, petitioner relied on the Sixth Circuit's decision in *United States* v. *Brock*, 501 F. 3d 762 (2007), which concerned two bail bondsmen who made payments to a court clerk in exchange for the alteration of court records. The Sixth Circuit held that "[t]o be covered by the [Hobbs Act], the alleged conspirators . . . must have formed an agreement to obtain 'property from *another*,' which is to say, formed an agreement to obtain property from someone outside the conspiracy." *Id.*, at 767. The District Court did not rule on this request prior to trial.

Petitioner's codefendant, Manrich, pleaded guilty during the trial, and at the close of the prosecution's case and again at the close of all evidence, petitioner moved for a judgment of acquittal on the conspiracy count based on

*Brock*.  The District Court denied these motions, conclud-
ing that the Fourth Circuit had already rejected *Brock*'s
holding in *United States* v. *Spitler*, 800 F. 2d 1267 (1986).

The District Court also refused to give petitioner's pro-
posed instruction.  Instead, the court adopted the sort of
standard instructions that are typically used in conspiracy
cases.  See generally L. Sand et al., Modern Federal Jury
Instructions: Criminal §19.01 (2015).  In order to convict
petitioner of the conspiracy charge, the jury was told, the
prosecution was required to prove (1) that two or more
persons entered into an unlawful agreement; (2) that
petitioner knowingly and willfully became a member of
the conspiracy; (3) that at least one member of the con-
spiracy knowingly committed at least one overt act; and
(4) that the overt act was committed to further an objec-
tive of the conspiracy.  The court "caution[ed]" "that mere
knowledge or acquiescence, without participation in the
unlawful plan, is not sufficient" to demonstrate member-
ship in the conspiracy.  App. 195.  Rather, the court ex-
plained, the conspirators must have had "a mutual under-
standing . . . to cooperate with each other to accomplish an
unlawful act," and petitioner must have joined the con-
spiracy "with the intention of aiding in the accomplish-
ment of those unlawful ends." *Id.*, at 192, 195.

The jury found petitioner guilty on both the conspiracy
count and the three substantive extortion counts, and the
District Court sentenced him to concurrent terms of 18
months in prison on all four counts.  On appeal to the
Fourth Circuit, petitioner's primary argument was the
same one he had pressed before the District Court: that
his conspiracy conviction was fatally flawed because the
conspirators had not agreed to obtain money from a person
who was not a member of the conspiracy.  The Fourth
Circuit rejected petitioner's argument and affirmed his
convictions.  750 F. 3d 399 (2014).

We then granted certiorari, 574 U. S. ___ (2015), and we

now affirm.

## II

Under longstanding principles of conspiracy law, a defendant may be convicted of conspiring to violate the Hobbs Act based on proof that he entered into a conspiracy that had as its objective the obtaining of property from another conspirator with his consent and under color of official right.

## A

In analyzing petitioner's arguments, we begin with the text of the statute under which he was convicted, namely, the general federal conspiracy statute, which makes it a crime to "*conspire* . . . to commit any offense against the United States." 18 U. S. C. §371 (emphasis added). Section 371's use of the term "conspire" incorporates long-recognized principles of conspiracy law. And under established case law, the fundamental characteristic of a conspiracy is a joint commitment to an "endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense." *Salinas* v. *United States*, 522 U. S. 52, 65 (1997); see 2 J. Bishop, Commentaries on the Criminal Law §175, p. 100 (rev. 7th ed. 1882) ("Conspiracy, in the modern law, is generally defined as a confederacy of two or more persons to accomplish some unlawful purpose"); J. Hawley & M. McGregor, The Criminal Law 99–100 (3d ed. 1899) (similar); W. LaFave, Criminal Law 672 (5th ed. 2010) (similar).

Although conspirators must "pursue the same criminal objective," "a conspirator [need] not agree to commit or facilitate each and every part of the substantive offense." *Salinas*, *supra*, at 63. A defendant must merely reach an agreement with the "specific intent that the underlying crime *be committed*" by some member of the conspiracy. 2 K. O'Malley, J. Grenig, & W. Lee, Federal Jury Practice

and Instructions: Criminal §31:03, p. 225 (6th ed. 2008) (emphasis added); see also *id.*, §31:02, at 220 (explaining that a defendant must "intend to agree and must intend that the substantive offense *be committed*" (emphasis added)). "The government does not have to prove that the defendant intended to commit the underlying offense himself/herself." *Id.*, §31:03, at 226. Instead, "[i]f conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators." *Salinas*, *supra*, at 64; see Sand, *supra*, §19.01, at 19–54 ("[W]hen people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent for the other conspirators in carrying out the conspiracy").

A few simple examples illustrate this important point. Entering a dwelling is historically an element of burglary, see, *e.g.*, LaFave, *supra*, at 1069, but a person may conspire to commit burglary without agreeing to set foot inside the targeted home. It is enough if the conspirator agrees to help the person who will actually enter the dwelling, perhaps by serving as a lookout or driving the getaway car. Likewise, "[a] specific intent to distribute drugs oneself is not required to secure a conviction for participating in a drug-trafficking conspiracy." *United States* v. *Piper*, 35 F. 3d 611, 614 (CA1 1994). Agreeing to store drugs at one's house in support of the conspiracy may be sufficient. *Ibid.*

Not only is it unnecessary for each member of a conspiracy to agree to commit each element of the substantive offense, but also a conspirator may be convicted "even though he was incapable of committing the substantive offense" himself. *Salinas*, *supra*, at 64; see *United States* v. *Rabinowich*, 238 U. S. 78, 86 (1915) ("A person may be guilty of conspiring although incapable of committing the objective offense"); Sand, *supra*, §19.01, at 19–3 ("[Y]ou may find the defendant guilty of conspiracy despite the

fact that he himself was incapable of committing the substantive crime").

The Court applied these principles in two cases involving the Mann Act. See Act of June 25, 1910, ch. 395, 36 Stat. 825. Section 2 of the Mann Act made it a crime to transport a woman or cause her to be transported across state lines for an immoral purpose.[1] In *United States* v. *Holte*, 236 U. S. 140 (1915), a federal grand jury charged a woman, Clara Holte, with conspiring with a man named Chester Laudenschleger to violate this provision. The District Court dismissed the charge against Holte, holding that because a woman such as Holte could not be convicted for the substantive offense of transporting herself or causing herself to be transported across state lines, she also could not be convicted of conspiring to commit that

—————

[1] In full, §2 provided as follows:

"That any person *who shall knowingly transport or cause to be transported*, or aid or assist in obtaining transportation for, or in transporting, in interstate or foreign commerce, or in any Territory or in the District of Columbia, any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice; or who shall knowingly procure or obtain, or cause to be procured or obtained, or aid or assist in procuring or obtaining, any ticket or tickets, or any form of transportation or evidence of the right thereto, to be used by any woman or girl in interstate or foreign commerce, or in any Territory or the District of Columbia, in going to any place for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent or purpose on the part of such person to induce, entice, or compel her to give herself up to the practice of prostitution, or to give herself up to debauchery, or any other immoral practice, whereby any such woman or girl shall be transported in interstate or foreign commerce, or in any Territory or the District of Columbia, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding five thousand dollars, or by imprisonment of not more than five years, or by both such fine and imprisonment, in the discretion of the court." Act of June 25, 1910, ch. 395, 36 Stat. 825 (emphasis added).

offense.

In a succinct opinion by Justice Holmes, the Court rejected this argument, stating that "plainly a person may conspire for the commission of a crime by a third person," even if "she could not commit the substantive crime" herself. *Id.*, at 144–145.[2] The dissent argued that this holding effectively turned every woman who acquiesced in a covered interstate trip into a conspirator, see *id.*, at 148 (opinion of Lamar, J.), but the Court disagreed. The Court acknowledged that "there may be a degree of coöperation" insufficient to make a woman a conspirator, but it refused to rule out the possibility that a woman could conspire to cause herself to be transported. *Id.*, at 144. To illustrate this point, the Court provided the example of a woman who played an active role in planning and carrying out the trip.[3]

The Court expanded on these points in *Gebardi* v.

---

[2] The Court assumed that Holte could not be convicted as a principal for the substantive offense of causing herself to be transported across state lines. But the Court noted that it might be possible for a woman to violate §2 of the Mann Act in a different way: by "aiding in procuring any form of transportation for" a covered interstate trip. *Holte*, 236 U. S., at 144; see 36 Stat. 825 ("aid or assist in obtaining transportation"). If a woman could commit that substantive §2 violation, the Court explained, there is no reason why she could not also be convicted of conspiring to commit that offense. See 236 U. S., at 145. The Court, however, refused to hold that this was the only ground on which a woman like Holte could be convicted for conspiring to violate §2. *Id.*, at 144–145. It thus addressed the broader question of whether it was possible for a woman in Holte's position to commit the offense of conspiring "that Laudenschleger should procure transportation and should cause [Holte] to be transported." *Id.,* at 144.

[3] The Court wrote:

"Suppose, for instance, that a professional prostitute, as well able to look out for herself as was the man, should suggest and carry out a journey within the act of 1910 in the hope of blackmailing the man, and should buy the railroad tickets, or should pay the fare from Jersey City to New York, she would be within the letter of the act of 1910, and we see no reason why the act should not be held to apply." *Id.*, at 145.

*United States*, 287 U. S. 112 (1932), another Mann Act conspiracy case. A man and a woman were convicted for conspiring to transport the woman from one state to another for an immoral purpose. *Id.*, at 115–116. In deciding the case, the *Gebardi* Court explicitly reaffirmed the longstanding principle that "[i]ncapacity of one to commit the substantive offense does not necessarily imply that he may with impunity conspire with others who are able to commit it." *Id.*, at 120. Moreover, the Court fully accepted *Holte*'s holding that a woman could be convicted of conspiring to cause herself to be transported across state lines. See 287 U. S., at 116–117. But the Court held that the evidence before it was insufficient to support the conspiracy convictions because it "show[ed] no more than that [the woman] went willingly upon the journeys for the purposes alleged." *Id.*, at 117. Noting that there was no evidence that the woman was "the active or moving spirit in conceiving or carrying out the transportation," the Court held that the evidence of her "mere consent" or "acquiescence" was not enough. *Id.*, at 117, 123.[4]

––––––––––

[4]The path of reasoning by which the *Gebardi* Court reached these conclusions was essentially as follows:

First, the Court perceived in §2 of the Mann Act a congressional judgment that a woman should not be convicted for the offense created by that provision if she did no more than consent to or acquiesce in the interstate trip. *Gebardi*, 287 U. S., at 123. The Court concluded that the transported woman could never be convicted under the language prohibiting a person from transporting a woman or causing a woman to be transported across state lines for an immoral purpose. See *id.*, at 118–119 ("The Act does not punish the woman for transporting herself"). And with respect to the statutory language making it a crime to "'aid or assist' someone else in transporting or in procuring transportation for herself," the Court held that aiding and assisting requires more than mere "consent" or "acquiescence." *Id.*, at 119; see also *Rosemond* v. *United States,* 572 U. S. ___, ___–___ (2014) (slip op., at 7–9) (aiding and abetting requires intent to facilitate commission of offense).

Second, turning to the issue of conspiracy, the Court reasoned that something more than the woman's mere consent or acquiescence was

*Holte* and *Gebardi* make perfectly clear that a person may be convicted of conspiring to commit a substantive offense that he or she cannot personally commit. They also show that when that person's consent or acquiescence is inherent in the underlying substantive offense, something more than bare consent or acquiescence may be needed to prove that the person was a conspirator.

### B

These basic principles of conspiracy law resolve this case. In order to establish the existence of a conspiracy to violate the Hobbs Act, the Government has no obligation to demonstrate that each conspirator agreed personally to commit—or was even capable of committing—the substantive offense of Hobbs Act extortion. It is sufficient to prove that the conspirators agreed that the underlying crime *be committed* by a member of the conspiracy who was capable of committing it. In other words, each conspirator must have specifically intended that *some conspirator* commit each element of the substantive offense.[5]

That is exactly what happened here: Petitioner, Moreno, and Mejia "share[d] a common purpose," namely, that *petitioner* and other police officers would commit every element of the substantive extortion offense. *Salinas*, 522 U. S., at 63–64. Petitioner and other officers would obtain property "under color of official right," something that Moreno and Mejia were incapable of doing because they were not public officials. And petitioner and other officers

---

needed to avoid undermining the congressional judgment that it saw in §2. The Court framed its holding as follows: "[W]e perceive in the failure of the Mann Act to condemn the woman's participation in those transportations which are effected with *her mere consent*, evidence of an affirmative legislative policy to leave *her acquiescence* unpunished." *Gebardi*, *supra*, at 123 (emphasis added).

[5] Section 371 also requires that one of the conspirators commit an overt act in furtherance of the offense. Petitioner does not dispute that this element was satisfied.

would obtain that money from "another," *i.e.*, from Moreno, Mejia, or Majestic. Although Moreno and Mejia were incapable of committing the underlying substantive offense as principals,[6] they could, under the reasoning of *Holte* and *Gebardi*, conspire to commit Hobbs Act extortion by agreeing to help petitioner and other officers commit the substantive offense. See *Holte*, 236 U. S., at 145 ("[A] conspiracy with an officer or employé of the government or any other for an offence that only he could commit has been held for many years to fall within the conspiracy section . . . of the penal code"); see also *Salinas*, *supra*, at 63–64; *Gebardi*, *supra*, at 120–121; *Rabinowich*, 238 U. S., at 86. For these reasons, it is clear that petitioner could be convicted of conspiring to obtain property from the shopowners with their consent and under color of official right.

## C

In an effort to escape this conclusion, petitioner argues that the usual rules do not apply to the type of Hobbs Act conspiracy charged in this case. His basic argument, as ultimately clarified,[7] is as follows. All members of a con-

————————

[6] The Government argues that the lower courts have long held that a private person may be guilty of this type of Hobbs Act extortion as an aider and abettor. See Brief for United States 36–37. We have no occasion to reach that question here.

[7] Petitioner's position has evolved over the course of this litigation. As noted, petitioner requested a jury instruction stating that "[i]n order to convict a defendant of conspiracy to commit extortion under color of official right, the government must prove beyond a reasonable doubt that the conspiracy was to obtain money or property from some person who was not a member of the conspiracy." App. 53. Under this instruction, as long as the shopowners were named as conspirators, petitioner could not have been convicted even if there was ample evidence to prove that he conspired with other Baltimore officers to obtain money from the shopowners. (And, indeed, when he first raised his *Brock* argument, see *United States* v. *Brock*, 501 F. 3d 762 (CA6 2007), another officer, Manrich, was still in the case and was charged with the same

spiracy must share the same criminal objective. The objective of the conspiracy charged in this case was to obtain money "from another, with his consent . . . under

––––––––––

conspiracy.)

　The petition for a writ of certiorari appears to have been based on this same broad argument. The question presented was phrased as follows: "Does a conspiracy to commit extortion require that the con-spirators agree to obtain property from someone outside the conspir-acy?" Pet. for Cert. i. And the argument in petitioner's opening brief was similar. See Brief for Petitioner 1 (arguing that "a Hobbs Act conspiracy requires that the conspirators agree among themselves to wrongly obtain property from someone *outside* the ring of conspiracy").

　As the Government's brief pointed out, this argument has strange implications. See Brief for United States 27. Assume that there was sufficient evidence to prove that petitioner conspired with other Balti-more officers to obtain money from Moreno and Mejia. Under petition-er's original, broad argument, this charge would be valid so long as Moreno and Mejia were not named as conspirators, but naming them in the indictment would render the charge invalid. Indictments, however, very often do not attempt to name all the conspirators, and the indict-ment in this case did not do so. See App. 36 (charging that petitioner and Manrich conspired with, among others, persons unknown). It would be very strange if the decision to name Moreno and Mejia ren-dered an otherwise valid charge defective. (Of course, petitioner might make the even broader argument that the conspiracy charge would fail if Moreno and Mejia, although not named as conspirators in the indict-ment, were later listed as conspirators in response to a bill of particu-lars or if the Government took that position at trial, perhaps by seeking to introduce their out-of-court statements under the co-conspirator exemption from the hearsay rule.)

　In response to the Government's argument, petitioner's reply brief claimed that his argument is actually the narrower one that we now consider, *i.e.*, that, as a matter of law, Moreno and Mejia cannot be members of a conspiracy that has as its aim the obtaining of money from them with their consent and under color of official right. See Reply Brief 17–20. The reply brief contends that acceptance of this narrower argument requires his acquittal because there is insufficient evidence to show that he conspired with anyone other than Moreno and Mejia. *Ibid.* The Court of Appeals, however, concluded otherwise. See 750 F. 3d 399, 412, n. 14 (CA4 2014). Nevertheless, because that court's decision was based primarily on other grounds, we address petitioner's argument as ultimately refined.

color of official right." But Moreno and Mejia did not have the objective of obtaining money "from another" because the money in question was their own. Accordingly, they were incapable of being members of the conspiracy charged in this case. And since there is insufficient evidence in the record to show that petitioner conspired with anyone other than Moreno and Mejia, he must be acquitted. See Reply Brief 3–11, 17–20.

This argument fails for a very simple reason: Contrary to petitioner's claim, he and the shopowners *did* have a common criminal objective. The objective was not that each conspirator, including Moreno and Mejia, would obtain money from "another" but rather that petitioner and other Baltimore officers would do so. See App. 36–37, Superseding Indictment ¶11 ("It was a purpose of the conspiracy for Moreno and Mejia to enrich over 50 BPD [Baltimore Police Department] Officers . . . in exchange for the BPD Officers' exercise of their official positions and influence to cause vehicles to be towed or otherwise delivered to Majestic"). Petitioner does not dispute that he was properly convicted for three substantive Hobbs Act violations based on proof that he obtained money "from another." The criminal objective on which petitioner, Moreno, and Mejia agreed was that *petitioner and other Baltimore officers* would commit substantive violations of this nature. Thus, under well-established rules of conspiracy law, petitioner was properly charged with and convicted of conspiring with the shopowners. Nothing in the text of the Hobbs Act even remotely undermines this conclusion, and petitioner's invocation of the rule of lenity[8] and prin-

---

[8] That rule applies only when a criminal statute contains a "grievous ambiguity or uncertainty," and "only if, after seizing everything from which aid can be derived," the Court "can make no more than a guess as to what Congress intended." *Muscarello* v. *United States*, 524 U. S. 125, 138–139 (1998) (internal quotation marks omitted).

ciples of federalism[9] is unavailing.

1

Petitioner argues that our interpretation makes the Hobbs Act sweep too broadly, creating a national antibribery law and displacing a carefully crafted network of state and federal statutes. He contends that a charge of conspiring to obtain money from a conspirator with his consent and under color of official right is tantamount to a charge of soliciting or accepting a bribe and that allowing such a charge undermines 18 U. S. C. §666 (a federal bribery statute applicable to state and local officials) and state bribery laws. He also argues that extortion conspiracies of this sort were not known prior to the enactment of the Hobbs Act and that there is no evidence that Congress meant for that Act to plow this new ground.

The subtext of these arguments is that it seems unnatural to prosecute bribery on the basis of a statute prohibiting "extortion," but this Court held in *Evans* that Hobbs Act extortion "under color of official right" includes the "rough equivalent of what we would now describe as 'taking a bribe.'" 504 U. S., at 260. Petitioner does not ask us to overturn *Evans*, see, *e.g.*, Brief for Petitioner 1; Tr. of Oral Arg. 4–5, 12–13, and we have no occasion to do so. Having already held that §1951 prohibits the "rough equivalent" of bribery, we have no principled basis for precluding the prosecution of conspiracies to commit that same offense.[10]

_____

[9] We are not unmindful of the federalism concerns implicated by this case, but those same concerns were raised—and rejected—in *Evans* v. *United States*, 504 U. S. 255 (1992), see *id.,* at 290 (THOMAS, J., dissenting) ("The Court's construction of the Hobbs Act is repugnant . . . to basic tenets of federalism"), which we accept as controlling here, see Part II–C–1, *infra*.

[10] JUSTICE THOMAS argues that *Evans* was wrongly decided, and his position makes sense to the extent that he simply refuses to accept that case. But it founders insofar as it suggests that even if *Evans* is ac-

Petitioner also exaggerates the reach of our decision. It does not, as he claims, dissolve the distinction between extortion and conspiracy to commit extortion. Because every act of extortion under the Hobbs Act requires property to be obtained with "consent," petitioner argues, proof of that consent will always or nearly always establish the existence of a conspiratorial agreement and thus allow the Government to turn virtually every such extortion case into a conspiracy case. But there are plenty of instances in which the "consent" required under the Hobbs Act will not be enough to constitute the sort of agreement needed under the law of conspiracy.

As used in the Hobbs Act, the phrase "with his consent" is designed to distinguish extortion ("obtaining of property from another, *with his consent*," 18 U. S. C. §1951(b)(2) (emphasis added)) from robbery ("obtaining of personal property from the person or in the presence of another, *against his will*," §1951(b)(1) (emphasis added)). Thus, "consent" simply signifies the taking of property under circumstances falling short of robbery, and such "consent" is quite different from the *mens rea* necessary for a conspiracy.

This conclusion is clear from the language of §1951 prohibiting the obtaining of property "from another, with his consent, *induced by wrongful use of actual or threatened force, violence, or fear*." §1951(b)(2) (emphasis added). This language applies when, for example, a store

_____

cepted in relation to substantive Hobbs Act charges, it should not be extended to conspiracy cases. See *post*, at 1 (dissenting opinion) ("I would not extend *Evans*' errors further"); *post*, at 3 ("[The Court's] holding . . . needlessly extends *Evans*' error to the conspiracy context"); *post*, at 4 ("The Court today takes another step away from the common-law understanding of extortion that the Hobbs Act adopted"). It would be very strange if a provision of the criminal code meant one thing with respect to charges of a substantive violation but something very different in cases involving a conspiracy to commit the same offense.

owner makes periodic protection payments to gang mem-
bers out of fear that they will otherwise trash the store.
While these payments are obtained with the store owner's
grudging consent, the store owner, simply by making the
demanded payments, does not enter into a conspiratorial
agreement with the gang members conducting the shake-
down.  See *Salinas*, 522 U. S., at 63–65 (conspirators must
pursue "the same criminal objective"); *United States* v.
*Bailey*, 444 U. S. 394, 405 (1980) (conspiracy requires "a
heightened mental state"); *Anderson* v. *United States*, 417
U. S. 211, 223 (1974) ("the prosecution must show that the
offender acted with a specific intent").  Just as mere ac-
quiescence in a Mann Act violation is insufficient to create
a conspiracy, see *Gebardi*, 287 U. S., at 121–123; *Holte*,
236 U. S., at 145, the minimal "consent" required to trig-
ger §1951 is insufficient to form a conspiratorial agree-
ment.  Our interpretation thus does not turn virtually
every act of extortion into a conspiracy.

Nor does our reading transform every bribe of a public
official into a conspiracy to commit extortion.  The "con-
sent" required to pay a bribe does not necessarily create a
conspiratorial agreement.  In cases where the bribe payor
is merely complying with an official demand, the payor
lacks the *mens rea* necessary for a conspiracy.  See *Sa-
linas*, *supra*, at 63–65; *Bailey*, *supra*, at 405; *Anderson*,
*supra*, at 223; *Gebardi*, *supra*, at 121–123.  For example,
imagine that a health inspector demands a bribe from a
restaurant owner, threatening to close down the restau-
rant if the owner does not pay.  If the owner reluctantly
pays the bribe in order to keep the business open, the
owner has "consented" to the inspector's demand, but
this mere acquiescence in the demand does not form a
conspiracy.[11]

———————

[11] Petitioner also claims that naming Moreno and Mejia as conspira-
tors opened the door for prosecutors to employ the potent party-joinder

2

While petitioner exaggerates the impact of our decision, his argument would create serious practical problems. The validity of a charge of Hobbs Act conspiracy would often depend on difficult property-law questions having little to do with criminal culpability. In this case, for example, ownership of the money obtained by petitioner is far from clear. It appears that the funds came from Majestic's account, App. 97–98, 149, and there is evidence that during the period of petitioner's membership in the conspiracy, Majestic was converted from a limited liability company to a regular business corporation, *id.*, at 145; App. in No. 12–4462 (CA4), pp. 655–656, 736. After that transformation, the money obtained by petitioner may have come from corporate funds. A corporation is an entity distinct from its shareholders, and therefore, even under petitioner's interpretation of the applicable law, Moreno and Mejia would have agreed that petitioner would obtain money "from another," not from them.

Suppose that Moreno or Mejia had made the payments by taking money from a personal bank account. Would that dictate a different outcome? Or suppose that Majestic was a partnership and the payments came from a company account. Would that mean that Moreno agreed that officers would obtain money "from another" insofar as they would obtain Mejia's share of the partnership funds and that Mejia similarly agreed that officers would obtain money "from another" insofar as they would obtain the

_____

and evidentiary rules that conspiracy charges make available. See Brief for Petitioner 10–11, 18, 26–27, 37. But the naming of the shopowners had no effect on joinder. The only other defendant named in the superseding indictment, Manrich, could have been joined even if the shopowners had not been named. Nor did naming Moreno and Mejia have any effect on the admissibility of evidence of overt acts committed by the Baltimore officers named as petitioner's co-conspirators.

share belonging to Moreno?

Or consider this example. Suppose that the owner and manager of a nightclub reach an agreement with a public official under which the owner will bribe the official to approve the club's liquor license application. Under petitioner's approach, the public official and the club manager may be guilty of conspiring to commit extortion, because they agreed that the official would obtain property "from another"—that is, the owner. But as "the 'another' from whom the property is obtained," Reply Brief 10, the owner could not be prosecuted. There is no apparent reason, however, why the manager but not the owner should be culpable in this situation.

## III

A defendant may be convicted of conspiring to violate the Hobbs Act based on proof that he reached an agreement with the owner of the property in question to obtain that property under color of official right. Because petitioner joined such an agreement, his conspiracy conviction must stand.

The judgment of the United States Court of Appeals for the Fourth Circuit is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–361

_____

## SAMUEL OCASIO, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[May 2, 2016]

JUSTICE BREYER, concurring.

I agree with the sentiment expressed in the dissenting opinion of JUSTICE THOMAS that *Evans* v. *United States*, 504 U. S. 255 (1992), may well have been wrongly decided. See *post,* at 1–2. I think it is an exceptionally difficult question whether "extortion" within the meaning of the Hobbs Act is really "the rough equivalent of . . . taking a bribe," *Evans*, 504 U. S., at 260 (internal quotation marks omitted)—especially when we admittedly decided that question in that case without the benefit of full briefing on extortion's common-law history, see *id.,* at 272 (O'Connor, J., concurring in part and concurring in judgment) ("Neither party in this case has briefed or argued the question").

The present case underscores some of the problems that *Evans* raises. For example, as in the scenario presented by today's Court, where the public health inspector asks for money from a restaurant owner in exchange for favorable reports, see *ante,* at 16, courts (and juries) will have to draw the difficult distinction between the somewhat involuntary behavior of the bribe payor and the voluntary behavior of the same bribe payor, which may determine whether there is or is not a conspiracy. Compare *United States* v. *Holte*, 236 U. S. 140, 144–145 (1915) (finding that a transported woman *could* conspire to violate the Mann Act), with *Gebardi* v. *United States*, 287 U. S. 112, 117,

123 (1932) (finding no such conspiracy).

Nonetheless, we must in this case take *Evans* as good law. See Tr. of Oral Arg. 20 (Petitioner "take[s] th[e] holding [in *Evans*] as a given"). That being so, I join the majority's opinion in full.

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–361

_____

## SAMUEL OCASIO, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[May 2, 2016]

JUSTICE THOMAS, dissenting.

Today the Court holds that an extortionist can conspire to commit extortion with the person whom he is extorting. See *ante,* at 18. This holding further exposes the flaw in this Court's understanding of extortion. In my view, the Court started down the wrong path in *Evans* v. *United States*, 504 U. S. 255 (1992), which wrongly equated extortion with bribery. In so holding, *Evans* made it seem plausible that an extortionist could conspire with his victim. Rather than embrace that view, I would not extend *Evans*' errors further. Accordingly, I respectfully dissent.

I

The Hobbs Act makes it a crime to "obstruc[t], dela[y], or affec[t] commerce . . . by . . . extortion." 18 U. S. C. §1951(a). The Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." §1951(b)(2).

In *Evans*, this Court held that, to obtain a conviction for extortion "under color of official right," the Government need show only "that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." 504 U. S., at 268. The Court therefore interpreted "extortion" under the Hobbs Act to be "the rough equivalent of . . . 'taking a

bribe.'" *Id.*, at 260.

I dissented in *Evans* because the Court's holding disregarded the "definite and well-established meaning" of the "under color of official right" element of extortion. *Id.,* at 279 (internal quotation marks omitted). " 'At common law it was essential that . . . money or property be obtained under color of office, that is, under the pretense that the officer was entitled thereto by virtue of his office. The money or thing received must have been claimed or accepted in right of office, and the person paying must have yielded to official authority.' " *Ibid.* (quoting 3 R. Anderson, Wharton's Criminal Law and Procedure §1393, pp. 790–791 (1957); emphasis deleted). When Congress enacted the Hobbs Act in 1946, "the offense was [thus] understood to involve not merely a wrongful taking by a public official, but a wrongful taking under a false pretense of official right." 504 U. S*.,* at 281 (emphasis deleted).

Given the established meaning of under-color-of-official-right extortion adopted in the Hobbs Act, the Court in *Evans* erred in equating common-law extortion with taking a bribe. *Id.,* at 283. Bribery and extortion are different crimes. *Ibid.* With extortion, "the public official is the sole wrongdoer." *Ibid.* Because the official "acts 'under color of office,' the law regards the payor as an innocent victim and not an accomplice." *Ibid.* An official who solicits or takes a bribe, by contrast, does not do so "under color of office"—that is, "under [a] pretense of official entitlement." *Ibid.* With bribery, "the payor knows the recipient official is not entitled to the payment," and "he, as well as the official, may be punished for the offense." *Ibid.* (emphasis deleted).

## II

Relying on *Evans*' definition of Hobbs Act extortion, see *ante,* at 2–3, 14, the Court holds that an extortionist can

conspire to commit extortion with the person whom he is extorting. *Ante,* at 10–11, 18. That holding is irreconcilable with a correct understanding of Hobbs Act extortion and needlessly extends *Evans*' error to the conspiracy context.

The general federal conspiracy statute makes it a crime for "two or more persons [to] conspire . . . to commit any offense against the United States." 18 U. S. C. §371. To be guilty of conspiracy to commit under-color-of-official-right extortion, then, two or more persons must conspire to "obtai[n] . . . property from another, with his consent, induced . . . under color of official right." §1951(b)(2).

Under a correct understanding of Hobbs Act extortion, it is illogical and wrong to say that two people conspired to extort one of themselves. As explained, in a Hobbs Act extortion case, the only perpetrator is the public official; the payor is a victim and not a participant. See *Evans,* 504 U. S., at 283 (THOMAS, J., dissenting). That understanding is irreconcilable with the view that an extortionist and his payor-victim can be co-conspirators to extortion of the payor. If a payor conspires with a public official for the payor to pay that official, then—whatever the two can be said to have done—they have not conspired to obtain payments to that official "under . . . pretense of official entitlement." *Ibid.* The extortionist and payor both know that the official is not entitled to the payments as a matter of his office. They have not conspired to commit Hobbs Act extortion.

The record confirms that the scheme here did not involve extortion as the common law understood that crime. Far from victimizing repair-shop owners Alexis Moreno and Edwin Mejia, the allegedly extortionate scheme benefited them and their repair shop. Over time, 90% or more of the shop's business came from paid-for referrals from police officers. Moreno and Mejia worked with Ocasio and other officers to maximize the shop's profits from the

scheme. Moreno and Mejia both pleaded guilty to Hobbs Act extortion and conspiracy—belying any claim that they were innocent victims. The Government itself does not maintain that the repair-shop owners paid Ocasio based on his assertion of "a false pretense of official right to the payment[s]." *Id.*, at 282 (THOMAS, J., dissenting). The Government is instead emphatic that Moreno and Mejia "participated as full partners" in the scheme and that "[t]he record . . . refutes any suggestion that [they] were the 'victims' of th[e] scheme." Brief for United States 41. Whatever crime Ocasio may have committed, it was not a conspiracy to commit extortion.

To be sure, the Court's conclusion is plausible under *Evans*' redefinition of extortion. But that is a reason not to extend *Evans*' error. Only by blurring the distinction between bribery and extortion could *Evans* make it seem plausible that an extortionist and a victim can conspire to extort the victim. The Court today takes another step away from the common-law understanding of extortion that the Hobbs Act adopted.

## III

The Court's decision is unfortunate because it expands federal criminal liability in a way that conflicts with principles of federalism. Even when *Evans* was decided nearly 25 years ago, the Hobbs Act had already "served as the engine for a stunning expansion of federal criminal jurisdiction into a field traditionally policed by state and local laws—acts of public corruption by state and local officials." 504 U. S., at 290 (THOMAS, J., dissenting). By disregarding the distinction between extortion and bribery, *Evans* expanded the Hobbs Act to allow federal prosecutors to reach more conduct by state and local government officials. See *id.,* at 291–294. That expansion was unwarranted. Congress had not made its intent to regulate state officials "unmistakably clear in the language of the" Hobbs

Act, *Gregory* v. *Ashcroft*, 501 U. S. 452, 460 (1991) (internal quotation marks omitted), so this Court had no basis for reading the Hobbs Act so expansively. *Evans*, *supra*, at 291–292 (THOMAS, J., dissenting); see *Jones* v. *United States*, 529 U. S. 848, 858 (2000) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance in the prosecution of crimes" (internal quotation marks omitted)).

Today the Court again broadens the Hobbs Act's reach to enable federal prosecutors to punish for conspiracy all participants in a public-official bribery scheme. The invasion of state sovereign functions is again substantial. The Federal Government can now more expansively charge state and local officials. And it can now more easily obtain pleas or convictions from these officials: Because the Government can prosecute bribe-payors with sweeping conspiracy charges, it will be easier to induce those payors to plead out and testify against state and local officials. The Court thus further wrenches from States the presumptive control that they should have over their own officials' wrongdoing.

As in *Evans*, the Court cites no statutory text "clearly" authorizing this intrusion into matters presumptively left to the States. *Jones*, *supra,* at 858. As in *Evans*, there is no need for the Court's overreach because state law already punishes the conduct at issue here. See Md. Crim. Law Code Ann. §9–201 (2012) (punishing bribery of and bribery by a public official); cf. *United States* v. *Brock*, 501 F. 3d 762, 769 (CA6 2007) ("No one doubts that the States have criminal laws prohibiting their citizens from bribing public officials. [We cannot think of] any reason to doubt the States' willingness to invoke these laws when their citizens engage in [a brazen bribery scheme]"). And, as in *Evans*, the Court reaches its decision with barely a nod to the sovereignty interests that it tramples. See *ante,* at

13–14, and n. 9 (summarily dismissing as "unavailing" Ocasio's "invocation of . . . principles of federalism"). As in *Evans*, I cannot agree.

*   *   *

Consistent with the Hobbs Act's text, I would hold that an extortionist cannot conspire to commit extortion with the person whom he is extorting. Accordingly, I would reverse the Court of Appeals' judgment upholding Ocasio's conspiracy conviction.

For these reasons, I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

No. 14–361

SAMUEL OCASIO, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[May 2, 2016]

JUSTICE SOTOMAYOR, with whom THE CHIEF JUSTICE joins, dissenting.

If a group of conspirators sets out to extort "another" person, we ordinarily think that they are proposing to extort money or property from a victim outside their group, not one of themselves. Their group is the conspiratorial entity and the victim is "another" person.

But in upholding the conspiracy conviction here, the Court interprets the phrase extorting property "from another" in the Hobbs Act contrary to that natural understanding. It holds that a group of conspirators can agree to obtain property "from another" in violation of the Act even if they agree only to transfer property among themselves.

That is not a natural or logical way to interpret the phrase "from another." I respectfully dissent.

## I

The indictment here charged Ocasio, a former Baltimore police officer, with participating in a kickback scheme engineered by the owners of a local auto repair shop, brothers Herman Moreno and Edwin Mejia. Ocasio and other Baltimore officers referred car-accident victims to the brothers' shop for body repair work. In exchange, Moreno and Mejia paid Ocasio between $150 and $300 for each referral. The indictment pleaded that Ocasio, other

officers, and the brothers conspired in violation of the federal conspiracy statute, 18 U. S. C. §371, to commit extortion in violation of the Hobbs Act, §1951.

The federal conspiracy statute applies whenever "two or more persons conspire" to commit a federal offense and at least one of them acts in furtherance of the offense. §371. The Hobbs Act, a federal offense, punishes "[w]hoever" commits "extortion," §1951(a), and defines "extortion" as "the obtaining of property from another, with his consent, . . . under color of official right," §1951(b)(2). "Extortion" includes taking a bribe. See *Evans* v. *United States*, 504 U. S. 255 (1992).[1] Putting this all together, in charging Ocasio with conspiring to commit extortion, prosecutors charged him with agreeing to take bribes "from another" person. §1951(b)(2).

At trial, rather than attempt to prove that Ocasio agreed with other *officers* to take bribes from Moreno and Mejia, the Government contended that when Ocasio agreed to take the brothers' bribes, he and the *brothers* agreed that Ocasio would obtain property "from another" person, *i.e.,* someone other than himself. Ocasio argued, by contrast, that it is impossible for a group of people to agree to obtain property "from another" without evidence that "another" person outside the conspiratorial agreement gave up their property. Ocasio conceded that he alone could violate the Hobbs Act by taking a bribe from one of the brothers, but maintained that he and the brothers as a group could not also violate the conspiracy statute by agreeing that one of them would take a bribe from themselves. This Court now rejects Ocasio's interpretation.

———————

[1] JUSTICE THOMAS sets forth why he believes *Evans* was wrongly decided. *Ante,* at 1 (dissenting opinion). No party asks us to overrule *Evans* in this case and so that question is not considered here.

## II

The Hobbs Act criminalizes extortion where a public official obtains property "from another." §1951(b)(2). The question here is how to define "another" in the context of a conspiracy to commit extortion. "Another" is a relational word. It describes how one entity is connected to a different entity. In particular, it describes an entity "different or distinct from the one first considered." Merriam-Webster's Collegiate Dictionary 51 (11th ed. 2003).[2]

In this case—a conspiracy to violate the Hobbs Act by obtaining property "from another"—the relevant entity to consider is the conspiratorial group. The federal generic conspiracy statute makes it a crime for two or more people to "conspire." §371. This Court gives the word "conspire" its conventional meaning. See *Salinas* v. *United States*, 522 U. S. 52, 63 (1997). To "conspire" is to agree, and the crux of a "conspiracy" is a "collective criminal agreement—[a] partnership in crime." *Callanan* v. *United States*, 364 U. S. 587, 593 (1961).

The most natural reading of "conspiring" to obtain property "from another," then, is a collective agreement to obtain property from an entity different or distinct from the conspiracy. But Ocasio, Moreno, and Mejia did not agree that Ocasio would obtain property from a person different or distinct from the conspirators as a group. They agreed only that Ocasio would take property from

_____

[2] See also Oxford English Dictionary 348 (1st ed. 1933) ("One more, one further, originally a second of two things; subsequently extended to anything additional or remaining beyond those already considered; an additional" (emphasis deleted)); Oxford English Dictionary 495 (2d ed. 1989) (same); Webster's New International Dictionary 110 (2d ed. 1950) ("A different, distinct, or separate (one) from the one considered"); New Oxford American Dictionary 65 (3d ed. 2010) ("used to refer to a different person or thing from one already mentioned or known about"); American Heritage Dictionary 74 (4th ed. 2000) ("Distinctly different from the first").

Moreno and Mejia—people who are *part of* rather than *distinct from* the conspiracy. "These three people did not agree, and could not have agreed, to obtain property from 'another' when no other person was involved." *United States* v. *Brock*, 501 F. 3d 762, 767 (CA6 2007).

This understanding of "another"—that it refers to someone outside the conspiracy—is consistent not only with the plain meaning of the Hobbs Act, but also with this Court's precedent explaining that the purpose of conspiracy law is to target the conduct of group crimes. Conspiracy law punishes the "collective criminal agreement," because a "[c]ombination" or "[g]roup association for criminal purposes" is more dangerous than separate individuals acting alone. *Callanan*, 364 U. S., at 593. A conspiracy is "a partnership in crime," a "confederation," a "scheme," and an "enterprise." *Pinkerton* v. *United States*, 328 U. S. 640, 644, 646–647 (1946). Accordingly, the law treats a conspiracy, at least in some ways, as an entity distinct from its individual members.

A defendant is guilty of conspiracy only if he agrees that the conspiratorial group intends to commit all the elements of the criminal offense. *Salinas*, 522 U. S., at 65 ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense"). Because the focus is on the group's conduct—what "endeavor" they have agreed to commit collectively—when individual members of a conspiracy act to advance the conspiratorial endeavor, they act not on behalf of themselves, but as "agents for [the conspiracy's] performance." *Hyde* v. *United States*, 225 U. S. 347, 369 (1912). It does not matter if a single member of the group undertakes to commit every element of the offense. *Salinas,* 522 U. S., at 63–64 ("The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other"). When that one member acts as an agent for

the conspiracy in furthering their collective endeavor, his actions are "attributable to the others," not just the individual agent alone. *Pinkerton,* 328 U. S., at 647; see also *id.,* at 646 ("[S]o long as the partnership in crime continues, the partners act for each other in carrying it forward").

Accordingly, whether a criminal conspiracy exists depends on what the conspirators agreed to do as a group. This principle confirms that "from another" is best understood as relating the conspiratorial enterprise to another person outside the conspiracy. A conspiracy to obtain property "from another," then, is the group agreement that at least one member of the group will obtain property from someone who is not a part of their endeavor.

Departing from this natural reading of the text, the Court holds that Ocasio can be punished for conspiracy because Ocasio obtained property "from another" (Moreno and Mejia) and Ocasio, Moreno, and Mejia agreed that Ocasio would engage in that conduct. In order to reach this conclusion, the Court implicitly assumes that the Hobbs Act's use of "from another" takes as its reference point only a single member of the conspiracy, here, Ocasio, rather than the group of conspirators as a whole. See *ante,* at 5.

But what is the basis for that assumption? The Court never explains. It is not based on the plain language of the Hobbs Act. A natural reading of the text seems to foreclose it—Moreno and Mejia are not "distinct or different from" the group that formed the "collective criminal agreement." And the Court's assumption does not follow from prior precedent or any first principles of conspiracy law. See Part III, *infra.*

Both the plain meaning of the statute and general principles of conspiracy law lead to the same conclusion: A conspiracy to commit extortion by obtaining property "from another" in violation of the Hobbs Act should exist

only when the conspirators agree to obtain property from someone outside the conspiracy.

## III

The Court does not ground its decision in the Hobbs Act's use of the language "from another." It instead relies on what it says are "age-old principles of conspiracy law." *Ante,* at 1. But it does so to no avail. Most of these so-called principles are derived from decisions that turn on interpreting the *text* of another federal statute—the Mann Act. And the remaining generic principles the Court cites do not resolve the precise question in this case: whether the Hobbs Act's use of the phrase obtain property "from another" adopts the perspective of an individual conspirator or the conspiratorial group as a collective.

The Court's best support comes from cases interpreting the Mann Act, which made it a crime for "any person [to] knowingly transport . . . in interstate or foreign commerce . . . any woman or girl for the purpose of prostitution or debauchery." *Ante,* at 7–11 (quoting ch. 395, 36 Stat. 825) (emphasis deleted). In one of its decisions, this Court held that even though the transported "woman or girl" was ostensibly the victim of the crime, nothing in the statute precluded prosecutors from also convicting the woman for conspiring with another person to transport herself illegally. *United States* v. *Holte,* 236 U. S. 140, 144 (1915). From this, the Court derives a generic principle of conspiracy law that a victim of Hobbs Act extortion can also be liable as a co-conspirator, just like the victim of a Mann Act violation can. *Ante,* at 8–11.

The Court stretches this Mann Act case beyond its tethers. The Court in *Holte* based its analysis entirely on the text of the Act, not generic principles of conspiracy law. Unlike the Hobbs Act's use of "*another* person," the Mann Act prohibits transporting "*any* woman." Based on this language, the Court concluded that a woman could be

held liable for conspiring with others to violate the Act. *Holte,* 236 U. S., at 144–45. For example, a "professional prostitute" could "suggest and carry out a journey" and "buy the railroad tickets." *Id.,* at 145; see also 36 Stat. 825 (Mann Act) (specifying that "procuring or obtaining, any ticket or tickets" was assistance of a criminal sort). Thus, the Court held, "she would be *within the letter of the act* . . . , and we see no reason why the act should not be held to apply." 236 U. S.*,* at 145 (emphasis added).

Moreover, because *Holte* based its holding on the text of the relevant substantive offense, its reasoning is consistent with this Court's actual principles of conspiracy, which adopt the perspective of the conspiratorial group to determine if their agreed-upon conduct violated the text of the statute. If the members of an alleged Mann Act conspiracy agree to transport illegally "*any* woman," the group enterprise can logically and naturally intend to transport a female member of the group. But that logic does not hold in this case, where the Hobbs Act requires the conspirators to agree to obtain property "from another." "Any," unlike "another," is not a relational word that requires determining who is in the group and who is out.

The Court similarly attempts to create a generic conspiracy principle when it cites *Gebardi* v. *United States*, 287 U. S. 112 (1932), another Mann Act case that relies on the Act's text. In *Gebardi*, the Court considered the question whether a woman who merely acquiesced to being transported could be held liable for conspiring to violate the Act. The Court held that a conspiracy could exist only if the woman aided and assisted in her own transportation—something more than "mere agreement" or "mere acquiescence" to being transported. *Id.,* at 119, 123. The Court based this decision explicitly on the language of the Mann Act, which "does not punish the woman for transporting herself . . . . For the woman to fall within the ban of the statute she must, at the least, 'aid or assist' some-

one else in transporting or in procuring transportation for herself." *Id.,* at 118–119.

Accordingly, the Court reasoned, the "necessary implication" of Congress' decision not to include a woman who merely consents in the scope of the Act was "that when the Mann Act and the conspiracy statute came to be construed together, as they necessarily would be," Congress did not intend for that woman to nevertheless always be held liable as a conspirator. *Id.,* at 123. This Court later characterized *Gebardi*'s holding as an "exceptio[n] of a limited character" to ordinary conspiracy law based on the "definition of the substantive offense," *i.e.,* the text of the statute. *Pinkerton,* 328 U. S., at 643. Whatever ordinary conspiracy principles might dictate, it was clear what Congress intended the outcome to be in that case.

The Court tries to elicit a general principle of conspiracy law from *Gebardi*: that while the ostensible victim of the statute—there a woman transported, here a person paying a bribe—cannot be convicted as a co-conspirator if she merely acquiesces to the transportation or bribe, an active participant in the conspiratorial group can nevertheless be found guilty of conspiracy. *Ante,* at 15–16. The Court draws this rough analogy in an attempt to cabin the scope of future Hobbs Act conspiracy charges to exclude potential defendants whose participation in extortion amounts to no more than "mere acquiescence." But this ignores the reasoning of *Gebardi*—the Court's reliance on the express terms of the Mann Act, not any generic conspiracy principles, led the Court to exclude a woman who "merely acquiesces" to being transported.

In addition to the Mann Act, the Court argues that its interpretation is correct because Mejia and Moreno can be held liable for conspiring to commit extortion even though they were incapable of committing the substantive crime themselves. (Because they are not public officials, Mejia and Moreno cannot obtain property "under color of official

right." *Ante,* at 5–7.)  True enough.  But this principle
does not lead to the conclusion that "from another" takes
the perspective of Ocasio as its reference point, as opposed
to the conspiratorial group.

For example, suppose a politician and a lobbyist con-
spire to have the lobbyist tell his clients to pay the politi-
cian bribes in exchange for official acts.  The lobbyist
cannot obtain those bribes under color of official right and
so could not be charged with a substantive Hobbs Act
extortion violation.  But the conspiracy would still violate
the Hobbs Act, see *Evans*, 504 U. S., at 268, because the
conspiratorial group obtained property "from another," *i.e.,*
from the clients who are outside the conspiracy that exists
between the lobbyist and the politician.  Now suppose the
lobbyist instead agrees to pay the bribe himself.  We would
be back to the question at the heart of this case.

The Court's incapable-of-committing-the-substantive-
offense principle therefore cannot do the work the Court
thinks it does.  It is entirely consistent to say obtaining
property "from another" in violation of the Hobbs Act
requires the conspirators to agree to obtain property from
someone outside the conspiracy, and to say that every
conspirator who enters into that agreement need not be
capable of committing the substantive offense himself.

Finally, the Court raises policy concerns: It mentions
that it would be odd to immunize the ostensible victims of
a conspiracy to commit extortion—here, Mejia and More-
no—if they play just as active a role in the conspiracy as
other members.  *Ante*, at 18.

While perhaps odd, that concern does not warrant the
Court's contortion of conspiracy law where there are other
criminal statutes—like federal antibribery laws and state
laws—that reach similar conduct.  See, *e.g.,* 18 U. S. C.
§666 (criminalizing bribery of state, local, or tribal officials
in specified circumstances); Md. Crim. Law Code Ann. §9–

201 (2012) (criminalizing bribery of public employee).[3]  Of course, the Government could have attempted to convict Ocasio for conspiracy on these facts without relying on the Court's odd theory—for example, by proving that Ocasio conspired with other Baltimore police officers to extort property from the brothers.

And, in its effort to make sure Ocasio, Moreno, and Mejia get their just deserts, the Court's atextual interpretation of the Hobbs Act exposes innocent victims of extortion to charges that they "conspired" with their extorter whenever they agree to pay a bribe.  The Court says not to worry, it will limit the scope of a conspiracy to exclude potential defendants whose participation in the extortion amounts to no more than "mere acquiescence," analogizing to *Gebardi*.  *Ante*, at 15–16.

But *Gebardi* grounded its "mere acquiescence" standard in the text of the Mann Act.  See *supra*, at 8–9.  Here, without any textual hook in the Hobbs Act, the Court rests on no more than intuitions drawn from basic examples.  If a restaurant owner threatened with closure by a health official reluctantly pays a bribe, the Court says that the owner is not guilty of conspiracy.  *Ante*, at 16.  According to the Court, he "consented" to extortion, but his mere acquiescence to an "official demand" did not create a conspiratorial agreement.  *Ibid.*  By contrast, the Court says, if a nightclub owner pursues a liquor license by asking his manager to bribe a public official, he is clearly guilty of conspiracy.  *Ante*, at 18.  He agreed with the public official that the official would obtain property "from another," *i.e.*, from him, in exchange for a license.  *Ibid.*

These examples raise more questions than answers.

---

[3] Moreover, any oddity in the Hobbs Act's failure to punish the bribe payors for conspiring with the bribe takers may be partly explained by this Court's decision to hold that extortion under the Hobbs Act reaches a public official who accepts a bribe in the first place.  See *ante*, at 1–2 (THOMAS, J., dissenting).

When does mere "consent" tip over into conspiracy?  Does it depend on whose idea it was?  Whether the bribe was floated as an "official demand" or a suggestion?  How happy the citizen is to pay off the public official?  How much money is involved?  Whether the citizen gained a benefit (a liquor license) or avoided a loss (closing the restaurant)?  How many times the citizen paid the bribes?  Whether he ever resisted paying or called the police?  The Court does not say.  It leaves it for federal prosecutors to answer those questions in the first instance, raising the specter of potentially charging everybody with conspiracy and seeing what sticks and who flips.

*     *     *

When three people agree to obtain property "from another," the everyday understanding of their agreement is that they intend to obtain property from someone outside of their conspiracy.  The Court reaches the opposite conclusion, based entirely on an assumption that the Hobbs Act's use of "from another" takes as its reference point the vantage of Ocasio alone, rather than the group endeavor that constitutes conspiracy.  The Court offers no explanation—grounded in either the text of the statute or so-called "age-old principles of conspiracy law"—for why that assumption is correct.

Conspiracy has long been criticized as vague and elastic, fitting whatever a prosecutor needs in a given case.  See, *e.g., Krulewitch* v. *United States*, 336 U. S. 440, 445–457 (1949) (Jackson, J., concurring).  This Court has warned that "we will view with disfavor attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions." *Grunewald* v. *United States*, 353 U. S. 391, 404 (1957).  Today, in reaching an unnatural outcome predicated on an unsupported assumption, the Court says never mind.

I respectfully dissent.